**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Southern District of New York

Case number *(if known):* _____    Chapter 15

☐ Check if this is an
amended filing

Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding    12/15

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).

| | |
|---|---|
| **1. Debtor's name** | Xenfin Fund 1 Trading Limited (in Voluntary Liquidation) |

**2. Debtor's unique identifier**

**For non-individual debtors:**

☐ Federal Employer Identification Number (EIN)   __ __ – __ __ __ __ __ __ __

☑ Other Guernsey ltd. company   Describe identifier reg. no. 63227

**For individual debtors:**

☐ Social Security number:   xxx – xx– ___ ___ ___ ___

☐ Individual Taxpayer Identification number (ITIN): 9 xx – xx – ___ ___ ___ ___

☐ Other _____ . Describe identifier _____

**3. Name of foreign representative(s)**

Matthew Wright, Benjamin Rhodes and James Toynton

**4. Foreign proceeding in which appointment of the foreign representative(s) occurred**

_____

**5. Nature of the foreign proceeding**

*Check one:*

☐ Foreign main proceeding
☐ Foreign nonmain proceeding
☑ Foreign main proceeding, or in the alternative foreign nonmain proceeding

**6. Evidence of the foreign proceeding**

☐ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

☑ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached. A certified copy of the May 4, 2020 Resolutions placing Xenfin into voluntary liquidation and appointing the joint voluntary liquidators

**7. Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)

☑ Yes

| Debtor | Xenfin Fund 1 Trading Limited (in Voluntary Liquidation) | Case number (if known) |
|---|---|---|
| | Name | |

**8. Others entitled to notice**

Attach a list containing the names and addresses of:

(i)   all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)  all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii) all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

**Country where the debtor has the center of its main interests:**

Guernsey

**Debtor's registered office:**

Lefebvre House, Lefebvre Street
Number          Street

P.O. Box

St. Peter Port
City          State/Province/Region     ZIP/Postal Code

Guernsey GYI 3TF
Country

**Individual debtor's habitual residence:**

Number          Street

P.O. Box

City          State/Province/Region     ZIP/Postal Code

Country

**Address of foreign representative(s):**

Richmond House, Ann's Place

P.O. Box

St. Peter Port
City          State/Province/Region     ZIP/Postal Code

Guernsey GYI 2NU
Country

**10. Debtor's website** (URL)

**11. Type of debtor**

Check one:

☑ Non-individual (check one):

   ☑ Corporation. Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

   ☐ Partnership

   ☐ Other. Specify: _____

☐ Individual

| Debtor | Xenfin Fund 1 Trading Limited (in Voluntary Liquidation) | Case number (if known) |
| | Name | |

| **12. Why is venue proper in this district?** | Check one: |
| | ☐ Debtor's principal place of business or principal assets in the United States are in this district. |
| | ☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district: |
| | _____ |
| | ☑ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because: |
| | Debtor possesses assets within the District. |

| **13. Signature of foreign representative(s)** | I request relief in accordance with chapter 15 of title 11, United States Code. |

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✖ Matthew Wright
Signature of foreign representative                    Printed name

Executed on 01/26/2021
MM / DD / YYYY

✖ _____          _____
Signature of foreign representative                    Printed name

Executed on _____
MM / DD / YYYY

| **14. Signature of attorney** | ✖ _____          Date    01/26/2021 |
| | Signature of Attorney for foreign representative           MM / DD / YYYY |

Warren Gluck
Printed name
Holland & Knight LLP
Firm name
31 W. 52nd St.
Number          Street

New York                          NY          10019
City                              State        ZIP Code

(212) 513-3200                    warren.gluck@hklaw.com
Contact phone                      Email address

4701421                          NY
Bar number                        State

Print      Save As...      Add Attachment                    Reset

Warren E. Gluck, Esq.
Kathleen M. St. John, Esq. (*pro hac vice forthcoming*)
Elliot A. Magruder, Esq.
HOLLAND & KNIGHT LLP
31 W. 52nd Street
New York, NY 10019
Telephone: 212-513-3200
Fax: 212-385-9010
Warren.Gluck@hklaw.com
Kathleen.StJohn@hklaw.com
Elliot.Magruder@hklaw.com

*Counsel for the Joint Voluntary Liquidators of Xenfin
Fund 1 Trading Limited (in Voluntary Liquidation)*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | : | Chapter 15 |
|  | : |  |
|  | : | Case No. 21-_____ (___) |
| XENFIN FUND 1 TRADING | : |  |
| LIMITED (in Voluntary Liquidation) | : |  |
|  | : |  |
| Debtor in a | : |  |
| Foreign | : |  |
| Proceeding.[1] | : |  |
|  | : |  |

------------------------------------------------------

## VERIFIED PETITION FOR RECOGNITION OF
## FOREIGN INSOLVENCY PROCEEDING AND RELATED RELIEF

Matthew Wright ("**Wright**"), Benjamin Rhodes, and James Toynton, in their capacity as

the joint voluntary liquidators (collectively, the "**JVLs**") of Xenfin Fund 1 Trading Limited (in

Voluntary Liquidation) ("**Xenfin**"), in voluntary liquidation (the "**Xenfin Liquidation**") pursuant

to sections 391 to 405 of Part XXII of the Companies (Guernsey) Law 2008 (the "**Companies**

**Law**"), by their undersigned United States counsel, Holland & Knight LLP, respectfully submits

---

[1] Xenfin Fund 1 Trading Limited (in Voluntary Liquidation) is a Guernsey limited company, with registration number 63237.

the Official Form Petition, this Verified Petition (together, the "**Petition**"), and the accompanying

Declarations of Matthew Wright, dated January 26, 2021 (the "**Wright Declaration**") and the

exhibits thereto, Warren Gluck, dated January 26, 2021 (the "**Gluck Declaration**"), and the

exhibits thereto, Sarah Brehaut, dated January 25, 2021 (the "**Brehaut Declaration**," collectively,

the "**Declarations**"), for entry of an Order pursuant to chapter 15 of title 11 of the United States

Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"):

(i) recognizing the Xenfin Liquidation as a foreign main proceeding under 11 U.S.C. §§ 1502, 1517(a) and (b)(1), or, in the alternative, as a foreign nonmain proceeding pursuant to 11 U.S.C. § 1517(b)(2) of the Bankruptcy Code;

(ii) appointing the JVLs as Xenfin's foreign representatives under 11 U.S.C. §§ 101(24), 1509 and 1517(a);

(iii) confirming that the JVLs have satisfied the requirements of 11 U.S.C. 1515;

(iv) granting automatic relief pursuant to section 1520 of the Bankruptcy Code;

(v) granting other and additional relief pursuant to sections 1507 and 1521(a) and (b) of the Bankruptcy Code as necessary, including authorizing the JVLs to examine witnesses, take evidence, and seek the production of documents concerning the assets, affairs, rights and/or obligations of Xenfin by:

(a) issuing discovery requests to:

(1) Venetian 1417 LP ("**Venetian 1417**"), Venetian 1061 LP ("**Venetian 1061**" and, together with Venetian 1417, the "**Venetian Entities**"), all entities registered or doing business in the United States that own, are owned by, or are affiliated with, the Venetian Entities, for (i) copies of all transaction documents related to the Venetian Properties (as defined below), (ii) information regarding Venetian Loan Agreements (as defined below), including but not limited to the representations and assertions made regarding their repayment, (iii) the location of the Venetian Entities' property, assets and rights of demand, (iv) the management, ownership, and structure of the partnerships, including the role and responsibility of the general partner of the Venetian Entities, and any formal or informal role Duncan

MacInnes ("**MacInnes**") holds or previously held with respect to the Venetian Entities;

(2)   Kevin Flaherty ("**Flaherty**") for information regarding (i) the Venetian Properties and any contemplated or consummated transactions regarding the same, (ii) the status of the proceeds of any such sale, (iii) the official and unofficial role(s) held or previously held by Flaherty with respect to the Venetian Entities and Flaherty's involvement with the conduct of the affairs of the Venetian Entities;

(3)   Sebastian Stoecker ("**Stoecker**") for information regarding (i) the Venetian Properties and any contemplated or consummated transactions regarding the same, (ii) the status of the proceeds of any such sale, (iii) the official and unofficial role(s) held or previously held by Stoecker with respect to the Venetian Entities and Stoecker's involvement with the conduct of the affairs of the Venetian Entities;

(4)   intermediary banks located in the Southern District of New York (the "**District**") that process U.S. dollar-denominated and foreign currency wire transfers and maintain records of such transfers with respect to the Venetian Entities, as well as any related persons and entities who may have received transfers from the Venetian Entities or any related entity (the "**IBD Subjects**") so as to ascertain information regarding the movement and dissipation of Xenfin assets, receivables and the commingling of the same in connection with contemplated litigation associated with the Venetian Loan Agreements and Venetian Guarantees (as defined below), as described below and in the accompanying Wright and Gluck Declarations;

(5)   New Wave Loans Residential, LLC ("**New Wave**") and NWL 2016 Evergreen LP ("**New Wave Evergreen**") regarding the mortgages with respect to the Venetian Properties and any related refinancing transactions with respect to the same; and

(6)   Spanish Rose LLC ("**Spanish Rose**, and collectively with the parties described in the foregoing (1)-(5), the "**Discovery Subjects**") regarding its purchase of the Venetian 1061 Property.

(b)   examining any witnesses located within the territorial jurisdiction of the United States, including but not limited to Flaherty and Stoecker, regarding the Venetian Properties and the operation of the Venetian Entities; and

(vi)   granting such other and further relief as the Court may deem just and proper.

## I.    **PRELIMINARY STATEMENT**

Xenfin is a Guernsey company in voluntary liquidation in Guernsey pursuant to the Resolutions issued on May 4, 2020. Xenfin maintains a registered office in Guernsey and has since its formation in 2017. Accordingly, the center of main interests for Xenfin is presumed to be Guernsey under 11 U.S.C. § 1516(c) . Xenfin served as a special purpose vehicle to invest in real estate in the United States and around the world. Consequently, Xenfin made multi-million dollar loans for investment properties in Florida, such loans which are now in default and face additional unauthorized encumbrances. In addition, the JVLs possess information indicating that the proceeds of the sale of a Florida property have been misappropriated at the expense of Xenfin's rights under the loans and security documents.

The JVLs have worked primarily from Guernsey (where they reside) and taken various steps under the Companies Law to facilitate an orderly liquidation and ultimately wind-down Xenfin for the ultimate benefit of its stakeholders, particularly with respect to the suspicious transactions in Florida. Among other things, the JVLs have directed Guernsey and United States counsel, regularly updated Guernsey regulators as to their progress, negotiated with representatives of Xenfin's counterparties (including those acting on behalf of the defaulted borrowers), and investigated outstanding assets and liabilities. The JVLs also control Xenfin's main liquid asset, its bank account in Guernsey.

As set forth below and in the Declarations, the Xenfin Liquidation is a "foreign main proceeding" under chapter 15 of the Bankruptcy Code because it is pending in Guernsey, where Guernsey is registered and has its center of main interests.[2] The JVLs maintain property in this District under 11 U.S.C. § 109 in the form of a retainer held in an undrawn attorney-trust account

---

[2] In the alternative, the JVLs submit that the Xenfin Liquidation is a "foreign nonmain proceeding" because Xenfin maintains nontransitory economic activity in Guernsey.

of the undersigned counsel.  The JVLs are the foreign representatives of Xenfin under 11 U.S.C. § 101(24) because they administer the assets and liabilities of Xenfin.  The Xenfin Liquidation is consistent with, and clearly not manifestly contrary to, the public policy of the United States.  The discovery relief requested under Section 1521(a) of the Bankruptcy Code is crucial to understand Xenfin's asset position, including with respect to the Florida property sold without Xenfin's notice and consent, and thus to the efficient administration of its estate.  Accordingly, Xenfin respectfully requests that the Court grant recognition of the Xenfin Liquidation as a foreign main proceeding and grant related relief.

## II.    **JURISDICTION, ELIGIBILITY, AND VENUE**

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

2.    Venue is proper in this District pursuant to 28 U.S.C. §§ 109(a) and 1410(1) because Xenfin's principal (and indeed only) assets in the United States are in New York.  Xenfin has an interest in funds in the amount of $25,000, deposited with Holland & Knight LLP ("**H&K**") and held by H&K in a non-interest bearing client trust account located in New York, New York (the "**H&K Retainer**").  Wright Declaration ¶ 125; *see also, e.g., In re Olinda Star Ltd.*, 614 B.R. 28, 39 (Bankr. S.D.N.Y. 2020) ("Courts in this Circuit have held that section 109(a) can be satisfied by bank accounts in the United States, including by an undrawn retainer.") (citations omitted); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (finding venue when New York counsel held a debtor's retainer in a New York account); *In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) ("Some courts, including this one, have held that an undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a).").

3.      As set forth below, the persons and entities from which the JVLs seek discovery relief are subject to the jurisdiction of the courts of the United States.

4.      The statutory predicates for the relief requested are sections 105(a), 1504, 1506, 1515, 1517, 1520, and 1521 of the Bankruptcy Code. The JVLs have properly commenced this case pursuant to sections 1504 and 1509(a) of the Bankruptcy Code by filing the Petition for recognition of the Xenfin Liquidation under section 1515 of the Bankruptcy Code.

## III.    FACTUAL BACKGROUND

### A.      Formation, Registered Office, and Operations of Xenfin and Related Entities

5.      Xenfin was formed on March 9, 2017 in Guernsey as a limited company with registration number 63237. Wright Declaration ¶ 9. The Articles of Association of Xenfin are subject to the provisions of the Companies Law. *Id.* ¶ 12 & Ex. 3. At the time of the issuance of the Resolutions, Xenfin maintained its registered office at 11 New Street, St Peter Port, Guernsey GY1 2PF. *Id.* ¶ 11. Following the entry into voluntary liquidation, the JVLs changed Xenfin's registered address to c/o Grant Thornton, Lefebvre House, Lefebvre Street, St Peter Port, Guernsey GY1 3TF. *Id.* ¶ 12.

6.      Xenfin is a special purpose vehicle, wholly owned by GFG Funds PCC Limited (in Voluntary Liquidation) ("**GFG Funds**"). Wright Declaration ¶ 9. GFG Funds, formed on March 14, 2014, is incorporated under the laws of Guernsey (namely the Companies Law). *Id.* The Manager of GFG Funds is GFG Limited (in Voluntary Liquidation) ("**GFG**"). *Id.* ¶ 12. On December 18, 2019, GFG was placed into voluntary liquidation in Guernsey and Wright was appointed as the liquidator to oversee the voluntary liquidation of GFG (the "**GFG Liquidation**").[3] *Id.* ¶ 11 & Ex. 2.

---

[3] On January 13, 2020, GFG appointed Andrew Duncan as a joint liquidator with Wright. *Id.*

7.      GFG Funds acted on behalf of and in the name of one of its cells, Xenfin Securitised Debt Fund 1 Cell ("**Xenfin Cell**").  Wright Declaration ¶ 10.  Xenfin was used as an investment vehicle for the benefit of Xenfin Cell, including to invest in real estate in the United States, including via loans to Delaware limited partnerships such as Venetian 1417 and Venetian 1061 LP.[4]  *Id.* ¶ 14.

8.      To that end, on March 24, 2017, GFG Funds and Xenfin Capital Limited ("**Xenfin Capital**") and Xenfin entered into an Investment Management Agreement, which is governed by the laws of Guernsey.  Xenfin Capital would advise Xenfin on investments.  *Id.* ¶ 15.

9.      Upon information and belief, the sole director and owner of Xenfin Capital is MacInnes.[5]  *Id.* ¶ 17.  Upon further information and belief, MacInnes resides in the United Kingdom.  *Id.*

10.     Each of GFG, and GFG Funds (and Xenfin Cell) were regulated by the Guernsey Financial Services Commission ("**GFSC**").  *Id.* ¶ 16.

**B.      The Xenfin Loans to the Venetian Entities**

11.     On or about November 15, 2017, pursuant to loan agreements (the "**Venetian Loan Agreements**"), Xenfin issued the following loans (Wright Declaration ¶¶ 19, 36 & Exs. 4, 7):

    i.   Up to £4,000,000 to Venetian 1417 (the "**Venetian 1417 Loan**"); and

    ii.  Up to £4,500,000 to Venetian 1061 (the "**Venetian 1061 Loan**," together, the "**Venetian Loans**").

12.     The Venetian Loans initially matured on May 20, 2019.  *Id.*

---

[4] GFG Funds also used Xenfin to make various investments abroad, including in Germany and the United Kingdom. *Id.* ¶ 10.

[5] Although MacInnes originally reputed to control the Venetian Entities, upon information and belief, Flaherty and Stoecker participate in the day-to-day affairs of the Venetian Entities.  Wright Declaration ¶ 18.

13.     Xenfin issued the Venetian Loans to finance development of two real estate properties located in Miami-Dade County, Florida.  Wright Declaration ¶¶ 22, 39.  Xenfin and the Venetian Entities executed security deeds requiring the Venetian Entities to grant a security interests over all their assets (together, the "**Venetian Mortgages**").  *Id.* ¶¶ 20-21, 37-38 & Exs. 5, 6.  The Venetian Mortgages specified that, without the consent of Xenfin, the Venetian Entities could not further encumber the Venetian Properties that could depreciate the value or otherwise impair the security held by the Venetian Loans.  *Id.* ¶¶ 23-24, 40-41.  In the event of default, the Venetian Mortgages permitted Xenfin to appoint a receiver over the Venetian Entities and to execute documents on its behalf.  *Id.*  ¶¶ 31-32, 48-49.  MacInnes personally guaranteed the Venetian Loans (together, the "**Venetian Guarantees**").  *Id.* ¶¶ 25, 41 & Exs. 6, 9.

14.     Public records indicate that Venetian 1417 acquired the Venetian 1417 Property and Venetian 1061 acquired the Venetian 1061 Property for $5.3 million each, on or about November 5, 2017 and November 8, 2017, respectively.  Wright Declaration ¶¶ 34, 42.  Xenfin should have made the Venetian Entities record any documents evidencing their respective debt obligations, but Xenfin failed to do so.  *Id.* ¶ 35, 43.  Nevertheless, the Venetian Entities' failure to record any documents evidencing their respective debt obligations to Xenfin was a breach of their contractual obligations.  *Id.*

C.     **Events Leading to the Voluntary Liquidation and Appointment of JVLs**

1.     **Unauthorized Encumbrances on the Venetian Properties**

15.     Public records show that the Venetian Entities placed encumbrances on the Venetian Properties, without the notice and consent of Xenfin.  In 2018, the Venetian Entities placed two additional mortgages on the Venetian Properties (Wright Declaration ¶¶ 51-57):

  i. the Venetian 1417 Property in favor of New Wave, purportedly as security for an alleged promissory note in the amount of $2.25 million (the  "**New Wave 1417 Mortgage**"); and

  ii. the Venetian 1061 Property, also in favor of New Wave, purportedly as security for an alleged promissory note in the amount of $2.5 million (the "**New Wave 1061 Mortgage**," together, the "**New Wave Mortgages**").[6]

16. The New Wave Mortgages each constitute an event of default under the Venetian Loan Agreements.  *Id.* ¶¶ 54, 57.

**2. Negotiations to Obtain Payment on the Venetian Loans**

17. After MacInnes indicated that the Venetian Loans would not be repaid by the initial maturity date of May 20, 2019, representatives of Xenfin, including Wright, negotiated multiple extensions of the repayment date.  Wright Declaration ¶¶ 60.  MacInnes induced these extension through representations of an imminent sale and realization of the Venetian Properties that did not come to fruition.  *Id.* ¶ 61.

18. For example, on April 29, 2019, MacInnes requested an extension to August 30, 2019 in order to enable "talks with two parties to materialise in the form of an acquisition of the sites, which MacInnes remained "confident that our team will be successful in securing a sale in the next 90 days."  *Id.* ¶ 62.  Xenfin granted the extension, but received no payments by August 30, 2019.  *Id.* ¶ 63.

19. This bait and switch became a trend.  In response to a request for payment, on December 31, 2019, MacInnes contacted Xenfin, and acknowledging the "complexity" of [the Venetian Properties], stated that he "remain[ed] very confident of a full realisation of funds.  I

---

[6] New Wave later assigned the mortgages to New Wave Evergreen.

expect a conclusion with 3 months either way." Wright Declaration ¶ 64 & Ex. 10. This necessitated an extension to January 31, 2020 for repayment of the Venetian Loans. *Id.*

20. The promised payment did not materialize and the Venetian Loans remain unpaid and in default. *Id.* ¶ 65.

### 3. The GFG Voluntary Liquidation

21. As noted above, in December 2019, Wright was appointed as the voluntary liquidator of GFG. His work took place primarily from Guernsey. Around this time, Wright began regular contact with the GFSC concerning both GFG and Xenfin. Wright Declaration ¶ 66.

22. One of Wright's duties as a joint voluntary liquidator entailed assisting in the investigation and potential recovery of loans issued by Xenfin Cell and Xenfin, including the Venetian Loans. *Id.* ¶ 67.

23. In fact, many of Wright's duties as a joint voluntary liquidator of GFG impacted the subsequent liquidation of Xenfin, and often necessitated similar tasks provided by the JVLs to Xenfin. Those duties included: (1) corresponding and negotiating with the agent for Xenfin's investor group; (2) furnishing updates to the GFSC concerning the wind down of GFG, including with respect to the amounts owed under the Venetian Loans; (3) engaging Guernsey and United States counsel; (4) meting out distributions to Xenfin Cell investors; (5) formulating a comprehensive plan to govern cash recovery methods and avenues of legal recourse; and (6) monitoring the reporting obligations of Xenfin Cell and Xenfin. *Id.* ¶ 68.

24. Contemporaneously, Wright routinely communicated with MacInnes, which included meetings to discuss the outstanding liabilities of the Venetian Entities on the Venetian Loans. *Id.* ¶¶ 69-70. Wright also learned from MacInnes that the latter, without explanation,

declined an offer to purchase the Venetian 1061 Property. *Id.* ¶¶ 71-72. As such, the JVLs (and especially Wright) acted in the interest of Xenfin prior to the Resolutions. *Id.* ¶¶ 73-75.

### 4.    Xenfin Goes into Voluntary Liquidation and the JVLs are Appointed

#### a.    The Resolutions and Principles of Guernsey Insolvency Law

25.    On May 4, 2020, Rose Nominees Limited ("**RNL**"), the authorized signatory of Xenfin, executed the Resolutions, commencing the Xenfin Liquidation and appointing the JVLs. Wright Declaration ¶¶ 2, 76 & Ex. 1.

26.    Sections 391-405 of the Companies Law authorizes the issuance of a special resolution to commence the Xenfin Liquidation. Brehaut Declaration ¶ 8. As a result, Xenfin must cease carrying on business from the commencement of the winding up. *Id.* ¶ 12. Subject to a limited exception, failing to terminate operations violates the Companies Law. *Id.*

27.    Upon the appointment of the JVLs, all powers of the directors cease, unless Xenfin or the JVLs concludes otherwise. Brehaut Declaration ¶ 12. An unsanctioned director purporting to exercise any powers could be in violation of the Companies Law and face penalty from the Guernsey court. *Id.* The Companies Law permits a shareholder to apply to a Guernsey court for directions concerning any aspect of a voluntary liquidation and the court may fashion relief as it sees fit. *Id.*

28.    In a voluntary liquidation, the JVLs role is to gather and realize Xenfin's assets, and to distribute assets pursuant to a statutory order of priority. Brehaut Declaration ¶ 9. The *pari passu* principle of distribution guides a voluntary liquidation, including with respect to any creditor

claims.[7]  *Id.* ¶ 14.  The JVLs are unaware of any creditors of Xenfin.  Wright Declaration ¶ 76.

This does not impact the validity of the Xenfin Liquidation.  Brehaut Declaration ¶ 16.[8]

29.    The Resolutions specifically permit the JVLs to (Wright Decl. ¶ 77 & Ex. 1):

   a.   Transact business on behalf of Xenfin;

   b.   Distribute the assets of Xenfin to its Members;

   c.   Vest the assets of Xenfin in trust for the benefit of such members; and

   d.   Receive remuneration while serving as JVLs.

30.    The Resolutions can only be set aside by a Guernsey court intervention.  Brehaut

Declaration ¶ 10.

31.    In addition to the powers enumerated in the Resolutions, the Companies Law

authorizes the JVLs to exercise "all powers which may be given … by the court."  *Id.* ¶ 13.  In

practice, these powers include (*id.*):

   a.   bring or defend civil actions on behalf of the company;

   b.   carry on the business of the company to the extent beneficial for winding up the
        company;

   c.   make capital calls;

   d.   sign all receipts and other documents on behalf of the company;

   e.   do any other act relating to the winding-up; and

   f.   do any court-authorized act.

32.    The Companies Law also imposes reporting requirements on the JVLs.  Brehaut

Declaration ¶¶ 19-20.  Although the Companies Law does not circumscribe the length of the

---

[7] Under Guernsey law, there is no statutory moratorium on creditors' claims when a voluntary winding-up commences. *Id.* ¶ 15.

[8] In the event of a surplus, the JVLs must apportion these assets according to a stakeholder's respective entitlement. *Id.* ¶ 13.

Xenfin Liquidation, on an annual basis, the JVLs must hold a general meeting if the Xenfin Liquidation remains pending. *Id.* ¶ 19. At the annual meeting, the JVLs must summarize their activities for the previous year. As soon as the Xenfin Liquidation concludes, the Companies Law must call a general meeting and prepare a complete accounting of the winding up. The notice of general meeting must be provided to the Guernsey Registrar of Companies, which publicizes the same.

33.     Although the JVLs are not court appointed and a Guernsey court does not exercise regular supervision over the Xenfin Liquidation, there are numerous circumstances in which a Guernsey court involvement could be sought. *Id.* ¶ 19. A stakeholder can petition the Guernsey court for clarification on any aspect of the Xenfin Liquidation. *Id.* ¶ 17. Moreover, a stakeholder, including a creditor or director, can petition to convert the Xenfin Liquidation into an official liquidation. *Id.* ¶ 18. Finally, the Companies Law authorizes a Guernsey court to unilaterally remove the JVLs. *Id.* ¶ 17.

b.      The JVLs' Activities in the Xenfin Liquidation

34.     Since the Resolutions, the JVLs have worked primarily from Guernsey (where they reside) and taking various steps under the Companies Law to wind-down Xenfin for the ultimate benefit of stakeholders. These efforts include parallel and iterative steps to maximize the recovery for all stakeholders, minimize the costs of wind-down, and lessen the additional dissipation of assets. Wright Declaration ¶¶ 108-109.

35.     The JVLs changed Xenfin's registered office address to c/o Lefebvre House, Lefebvre Street, St Peter Port, Guernsey GY1 3TF. As noted above, Xenfin is a Guernsey company and maintained a registered office in Guernsey since its formation. *Id.* ¶ 110.

36.    The JVLs transmitted the Resolutions to the Guernsey Registrar of Companies, which recorded the Resolutions. The JVLs took control of Xenfin's assets, including its bank account held in Guernsey at Butterfield Bank.  *Id.* ¶¶ 111, 114.

37.    The JVLs employ United States and Guernsey counsel to advise in the Xenfin Liquidation and increased pressure on MacInnes and the Venetian Entities to pay the now-defaulted Venetian Loans.  For instance, the JVLs authorized Guernsey counsel to send a formal demand letter (the "**Xenfin Demand**") setting forth a repayment schedule and listing document requests.[9]  Wright Declaration ¶¶ 78-82, 113 & Ex. 10.  Consequently, the parties nearly settled the debt, going as far as to prepare a settlement agreement that ultimately went unsigned.  *Id.* ¶ 83. The JVLs further directed United States to file the Venetian 1417 Foreclosure Complaint and the Delaware Complaint (as defined below).  *Id.* ¶¶ 104-107 & Exs. 16-17.

38.    The JVLs monitored and provided input into the purported sale of the Venetian 1061 Property.  *Id.* ¶¶ 114.  Further, the JVLs administered the purported repayment plan of the Venetian Loans proffered by MacInnes, which entailed ensuring compliance and tracking the dates and amounts owed.  *Id.* ¶ 115.  The JVLs are in near daily contact with MacInnes concerning the repayment of the Venetian Loans.  *Id.* ¶ 84.

39.    Moreover, the JVLs have communicated routinely with the agent for the investor group, and the GFSC, to provide a comprehensive and ongoing appraisal of the Xenfin Liquidation.  The JVLs notified the GFSC of the: (1) employment of United States and Guernsey counsel to assist in the Xenfin Liquidation; (2) implementation of an asset recovery plan; (3) the Xenfin Demand; (4) unsuccessful settlement negotiations with MacInnes and Xenfin Capital; (5)

---

[9] The Xenfin Demand also explicitly reserved the right to hold MacInnes liable under the unpaid Venetian Guarantees and to invoke the remedies afforded under the Venetian Loan Documents, including the appointment of a receiver over the Venetian Entities.  Wright Declaration ¶ 81.

delays in remittance of purported repayments on the Venetian Loans; (6) updated calculations and repayment dates of the Venetian Loans; and (7) the purported September 2020 sale of the Venetian 1061 Property.  Wright Declaration ¶ 115.

40.    The substantial majority of these actions occurred from the JVLs' offices in Guernsey.  *Id.* ¶ 108.

### 5.    The Undisclosed Sale and Refinancing of the Venetian Properties

41.    Soon after these efforts, the Venetian Entities executed two clandestine transactions that violated the Venetian Loan Documents.  Wright Declaration ¶¶ 88-94.  Notably, the transactions directly contradicted myriad representations MacInnes provided the JVLs.  *Id.* ¶ 95.

42.    On multiple occasions in December 2020, MacInnes informed the JVLs of an impending sale of the Venetian 1061 Property for roughly $5.1 million.  *Id.* ¶¶ 88-91 & Exs. 13-15.  For instance, on December 23, 2020, MacInnes explained that the sale would occur in short order, but had "not yet closed formally."  *Id.* ¶ 90 & Ex. 12.  According to MacInnes, the sale proceeds would satisfy the Venetian 1061 Loan, and would be transmitted to a trust account held by H&K, as the JVLs' United States counsel.  *Id.* ¶ 89.

43.    A week later, MacInnes updated the JVLs: "myself and our partner on the ground are pushing for the completion with a lot of pressure … Obviously we are incredibly keen to get this over the line and get funds to Guernsey for distribution and please know we are pushing hard to get this done before the [new year] as expected."  *Id.* ¶ 91 & Ex. 13.

44.    Notwithstanding these assurances that the sale remained pending, the JVLs discovered through a public records search that the Venetian 1061 Sale had *already closed in October 2020, and that title to the Venetian 1061 Property had been transferred to Spanish Rose*

*LLC*, a Florida limited liability company (the "**Venetian 1061 Sale**").[10]  *Id.* ¶ 92 & Ex. 14.  The proceeds from the Venetian 1061 Sale apparently also satisfied the New Wave 1061 Mortgage. *Id.*

45.     On the same day, the JVLs discovered, also from a public records request, that Venetian 1417 increased the debt held by New Wave Evergreen, secured by the Venetian 1417 Property, from $2.25 million to $6.85 million (the "**New Wave 1417 Refinancing**").  *Id.* ¶ 93 & Ex. 15.

46.     Xenfin did not consent to these transactions, nor was it notified in advance.  *Id.* ¶ 94.

47.     The JVLs immediately sought to recover Xenfin's rightful share of the Venetian 1061 Sale proceeds by directing MacInnes to remit the nearly $1.9 million to an account held at H&K.     Wright Declaration ¶¶ 96-103.  MacInnes represented that he would adhere to this protocol, only to then fail to make the payment for unverifiable reasons.  *Id.*

48.     The JVLs have since learned from MacInnes that the allocation of the Venetian 1061 Sale Proceeds prioritized (at Xenfin's expense) the satisfaction of a loan to New Wave Evergreen, which amounts to a loan of roughly $1.9 million from Venetian 1061 to the operating account of Venetian 1417, and closing costs.  *Id.*

49.     The $1.9 million loan between the Venetian Entities could be highly damaging to Xenfin's prospects for recovery of the Venetian 1061 Loan, as the JVLs believe this constituted the last remaining asset of Venetian 1061.  *Id.* ¶ 102.  Once it was secreted away, upon information and belief, Venetian 1061 became functionally insolvent.  *Id.*

50.     MacInnes also informed the JVLs that Venetian 1417 drew down roughly £2.5 million on the New Wave Financing, purportedly for further construction costs on the Venetian

---

[10] Spanish Rose appears to be third party transacting at arms-length.

1417 Property.   Wright Declaration ¶ 101.   The JVLs cannot verify the accuracy of this representation.

51.     Finally, MacInnes represented in January 2021 that his unnamed "equity partner" would pay the shortfall due on the Venetian 1061 Loan Agreement by the end of January 2021, and that the 1417 Property would be sold in November 2021 for roughly $20 million (notwithstanding the failure to deploy the funds in the operating account of Venetian 1417 for construction purposes).  *Id.* ¶ 103.  Of that $20 million, MacInnes claimed that $7.5 million would be distributed to New Wave, with the remainder of $12.5 million to Xenfin.  *Id.*

### 6.     The Delaware and Florida Litigation

52.     As a result of the misappropriation of proceeds from the Venetian 1061 Sale, the unauthorized New Wave Refinancing, and to avoid a repeat of the Venetian 1061 Sale, on January 20, 2021, the JVLs authorized H&K to file two lawsuits on behalf of Xenfin in the United States. *Id.* ¶ 104.

53.     First, Xenfin filed a Verified Complaint of Foreclosure against Venetian 1417 (the "**Venetian 1417 Foreclosure Complaint**") in the Miami Dade Circuit Court in and for 11th Judicial Circuit (Case No. 2021-001465-CA-01), seeking to foreclose on the Venetian 1417 Mortgage and to recover the total amount in damages of over $5.4 million.  *Id.* ¶ 105.

54. Second, Xenfin filed a Complaint against the Venetian Entities (the "**Delaware Complaint**") in the Chancery Court of the State of Delaware (Case No. 2021-0051), alleging breach of contract based on their respective breaches of the Venetian Loan Agreements.  The Delaware Complaint sought to recover the damages of over $10.7 million and also requested a temporary restraining order preventing the dissipation of assets or property of the Venetian

Entities, as well as the appointment of a receiver over the property of the Venetian Entities. *Id.* ¶ 106.

55.    The Delaware Complaint and the Venetian 1417 Foreclosure Complaint (together, the **"United States Litigation"**) remain pending. *Id.* ¶ 107.

IV.    **BASIS FOR RELIEF**

A.    **Xenfin is Eligible for Relief under Section 109(a) of the Bankruptcy Code**

56.    Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility requirements of 11 U.S.C. § 109(a). *See Olinda Star*, 614 B.R. at 39. Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor" under the Bankruptcy Code. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 77 F.3d 238, 246-48 (2d Cir. 2013). Section 109(a) does not require a specific quantum of property in the United States, nor does it indicate when or for how long such property must have a United States *situs*. *See, e.g., In re Berau Capital Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).

57.    Courts regularly hold that attorney retainers deposited in a New York bank account satisfy the "property in the United States" eligibility requirement of section 109(a). *See Olinda Star*, 614 B.R. at 40 (client trust account held by the debtor at law firm in New York satisfies 109(a)); *In re Foreign Econ. Indus. Bank Ltd., "Vneshprombank" Ltd.*, 607 B.R. 160, 171-72 (Bankr. S.D.N.Y. 2019) ("A foreign debtor may satisfy the section 109(a) property requirement by having a retainer."); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 373-74 (Bankr. S.D.N.Y. 2014) (finding that the debtor "had property in the United States in the form of a retainer [, which] is sufficient to satisfy the requirements of section 109(a) of the Bankruptcy Code").

58.    Here, Xenfin satisfies section 109(a) because it has property in the United States and in this district in the form of the H&K Retainer. Wright Declaration ¶ 125. The H&K Retainer

remains in the bank account and constitutes Xenfin's property (subject to H&K's applicable rights). *Id.*

**B.** **The Xenfin Liquidation Should be Recognized under Chapter 15**

59.     The Petition should be granted under Chapter 15 because: (1) it concerns a "foreign proceeding"; (2) it was commenced by the JVLs, who are duly authorized "foreign representatives"; and (3) all the required supporting documentation has been filed.[11]

### 1.     Legal Standards

60.     The Second Circuit holds that "[u]nique to the Bankruptcy Code," Chapter 15 contains a statement of purpose, which is "to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ." *In re Fairfield Sentry Ltd.*¸ 714 F.3d 127, 132 (2d Cir. 2013) (citing 11 U.S.C § 1501(a)). Chapter 15 and the Model Law "are designed to optimize disposition of international insolvencies by facilitating appropriate access to the court system of a host country (the United States, in the case of Chapter 15) by a representative of an insolvency proceeding pending in a foreign country." *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 292 (Bankr. S.D.N.Y. 2018) (citations omitted).

61.     Consequently, "Chapter 15 expresses a strong preference for providing assistance to foreign representatives in appropriate circumstances. *That congressional preference is not to be lightly disturbed.*" *In re Platinum Partners Value Arbitrage Fund L.P*, No. 18CV5176 (DLC), 2018 WL 3207119, *4 (S.D.N.Y. June 29, 2018) (emphasis added and footnote omitted). "Chapter 15 … provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter[.]" *In re Oi S.A.*, 587 B.R. 253, 264 (Bankr. S.D.N.Y. 2018).

---

[11] There do not appear to be any decisions in which a court has issued an order concerning recognition of a Guernsey liquidation. In 2019, a Chapter 15 petition was filed to recognize a Guernsey administration proceeding. *See In re BSG Res. Ltd.*, No. 19-11845-shl (Bankr S.D.N.Y.). The petition for recognition is pending.

### 2.    The Xenfin Liquidation is a "Foreign Proceeding"

#### a.    A Voluntary Liquidation can be a "Foreign Proceeding"

62.    The Xenfin Liquidation satisfies the definition of "foreign proceeding" as required by section 1517(a)(1) of the Bankruptcy Code.  Under Section 101(23) of the Bankruptcy Code, a "foreign proceeding" is defined as Section 101(23) of the Bankruptcy Code defines a foreign proceeding as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."

63.    As noted above, the Xenfin Liquidation is presently a voluntary liquidation.  The Second Circuit or this Court does not appear to have addressed whether a voluntary liquidation, as a general matter, can constitute a "foreign proceeding" as defined in 11 U.S.C. § 101(23).  However, multiple courts in other circuits, including the Third Court Circuit Court of Appeals, hold that a voluntary liquidation is eligible for recognition under Chapter 15.  *See, e.g., In re Manley Toys Ltd.*, 500 B.R. 637-38 (Bankr. D.N.J. 2018) (voluntary liquidation in Hong Kong is a "proceeding" because the Hong Kong insolvency laws constitute a "statutory framework that sets forth the duties and responsibility of liquidators"); *In re ABC Learning Ctrs.*, 445 B.R. 318, 327-328 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) (voluntary winding up pursuant to insolvency provisions of Australia Corporations Act is a "proceeding"); *In re Betcorp Ltd.*, 400 B.R. 266, 277-278 (Bankr. D. Nev. 2009) (same).[12]

---

[12] Applying the predecessor statute to Chapter 15 of the Bankruptcy Code, 11 U.S.C. § 304, this court held in *Petition of Ward* that a voluntary liquidation in Namibia constituted a "foreign proceeding" because, *inter alia*, the proceeding operated for the collective good of stakeholders, the duties of the voluntary liquidator were "virtually identical" to an official liquidator, and any aggrieved creditors possess a right of access to Zambian courts.  *See* 201 B.R. 357, 359-361 (Bankr. S.D.N.Y. 1996).

64.     As explained in *Betcorp*, in the context of Chapter 15, "the word 'proceeding' requires a broader definition in order to achieve the statutory directive of interpretation consistent with the understandings and the usages of international law and the UNCITRAL Model Law." 400 B.R. at 277.  As such:

> the "essence of a 'proceeding' [is] the acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice.  In the context of corporate insolvencies, the hallmark of a 'proceeding' is a statutory framework that constrains a company's action and that regulates the final distribution of a company's assets.

*Id.* at 278.

65.     Under these principles, the Xenfin Liquidation is a "proceeding" under 11 U.S.C. § 101(23).  The Companies Law establishes a comprehensive statutory framework for the voluntary liquidation of a Guernsey company like Xenfin.  First, the Companies Law constrains a company's actions in voluntary liquidation, such as the cessation of the powers of the corporate directors, and provides penalties for any *ultra vires* actions of a director post-voluntary liquidation. Brehaut Declaration ¶ 12; *see Betcorp*, 400 B.R. at 280 ("The fact that commencing this type of external administration terminates the authority of the company's directors, combined with the fact that the winding up cannot be stopped by the equity interest holders once they have passed the special resolution, lends further support to a finding that this Australian legal process is a proceeding.").

66.     Second, the Companies Law also governs the JVLs' distribution of Xenfin's assets. The Companies Law requires the JVLs to disburse assets on a *pari passu* basis.  Brehaut Declaration ¶ 14; *see Manley Toys*, 580 B.R. at 638 (that the Hong Kong insolvency law determines "distribution priorities" is indicative of a proceeding).

67.     Third, the Companies Law provides specific rights to interested parties other than the JVLs.  The Companies Law affords offended parties the opportunity to petition a Guernsey

court to convert the Xenfin Liquidation into an official liquidation. Brehaut Declaration ¶ 18. The Companies Law also allows a Guernsey court to remove and replace the JVLs unilaterally. *Id.* ¶ 17. The Companies Law also mandates that a voluntary winding up cannot be reversed absent court intervention. *Id.* ¶ 10.

68.    Fourth, the Companies Law requires the JVLs to convene an annual general meeting to provide updates on the progress of the Xenfin Liquidation both during the pendency of the Xenfin Liquidation and once it is completed. *Id.* ¶¶ 19-20.

69.    Finally, that the JVLs did not apply or petition a Guernsey court to commence the Xenfin Liquidation is not evidence that it is not a "foreign proceeding." For instance, in *Betcorp*, the court found "not persuasive," given its interpretation of the applicable Australian insolvency law, the argument that "an absence of an application or a petition" to a court "proves that a winding up is not a proceeding[.]" *Betcorp*, 400 B.R. at 280.

   b.    The Xenfin Liquidation Meets the Elements of 11 U.S.C. § 101(23)

70.    Courts apply seven elements to determine if 11 U.S.C. § 101(23) has been satisfied: (1) [the existence] of a proceeding; (2) that is judicial or administrative; (3) that is collective in nature; (4) that is in a foreign country; (5) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (6) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (7) which is for the purposes of reorganization or liquidation." *See In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018).

71.    The Xenfin Liquidation satisfies these elements.

72.    First, for the reasons set forth above, the Xenfin Liquidation is a "proceeding."

73.    Second, the Xenfin Liquidation is a "judicial or administrative proceeding." Many of the JVLs' tasks are administrative in nature, *i.e.*, collecting assets, distributing assets *pari passu*

and in compliance with the prioritization scheme in the Companies Law, convening meetings, preparing various reports, and investigating the assets of Xenfin, including in particular the Venetian 1061 Sale. *See* Wright Declaration ¶¶ 108-115; *see also ABC Learning Ctrs.*, 445 B.R. at 328. The Xenfin Liquidation becomes judicial in character if a Guernsey court invokes supervisory authority, including to remove the JVLs and/or convert the Xenfin Liquidation into a compulsory liquidation. Brehaut Declaration ¶¶ 17-18; *see also ABC Learning Ctrs.*, 445 B.R. at 328. ("A winding up becomes judicial in character whenever the Australian Courts exercises its supervisory powers.").

74.     Third, the Xenfin Liquidation is "collective in nature." Although this factor is typically evaluated in the context of the benefits granted to creditors, which Xenfin does not presently have, the court can also examine "the law governing the foreign action and the parameters of the particular proceeding[.]" *In re PT Bakrie Telecom TBk*, 601 B.R. 707, 720 (Bankr. S.D.N.Y. 2019) (quoting *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136-37 (S.D.N.Y. 2014)).

75.     Notably, the Third Circuit in *ABC Learning* held that the Australian foreign proceeding was collective even though the foreign representative had no assets to distribute to creditors. *See* 728 F.3d at 309. Rather, the paucity of assets for creditors did not "affect the collective nature of the Australian liquidation proceeding. Instead, it turns on the particular facts of [the debtor's] debts." *Id.* Likewise, Xenfin's absence of creditors merely reflects the nature of its assets, which do not necessarily result in Xenfin incurring liabilities. GFG Funds used Xenfin as an investment vehicle to hold assets in the form of debt receivables, such as the Venetian Loans, and not to pledge or otherwise encumber its own assets that could result in creditor(s). *See* Wright

Declaration ¶¶ 9-10, 14.  Accordingly, Xenfin's lack of creditors does not preclude the court from concluding that the Xenfin Liquidation is a "collective" proceeding under Chapter 15.

76.     Fourth, the Xenfin Liquidation proceeds in Guernsey, a foreign country.  Xenfin is a Guernsey company and maintains a registered office there.  *Id.* ¶¶ 9, 12.  The Xenfin Liquidation operates under Guernsey law and is governed by the Companies Law.  Brehaut Declaration. ¶¶ 6-7.  The JVLs are primarily based in Guernsey.  Wright Declaration ¶ 108.   If applicable, the Guernsey courts would exercise authority over the Xenfin Liquidation.  Brehaut Declaration ¶¶ 17-18.  *See also, e.g., ABC Learning Ctrs.*, 445 B.R. at 330; *Manley Toys*, 580 B.R. at 643.

77.     Fifth, the Xenfin Liquidation proceeds under the auspices of the Companies Law, which is a statutory scheme "relating to insolvency or adjustment of debt" pursuant to 11 U.S.C. § 101(23).   In other words, the proceeding "must be authorized by a statute that deals with corporate insolvency or the adjustment of corporate debts.  The fact that a proceeding has a 'unified structure of external administration provisions' favors a finding that the statute meets this criterion."  *Ashapura*, 480 B.R. at 138 (quoting *Betcorp*, 400 B.R. at 282).

78.     The Companies Law is such a statute.   The Companies Law authorizes the Resolutions and the appointment of the JVLs, outlines the JVLs' powers and responsibilities, dictates the process for distribution of assets (including payment priority), lists sanctionable acts and corresponding penalties, and delineates the rights of stakeholders, including to petition for the conversion of the Xenfin Liquidation into a compulsory liquidation.  *See* Brehaut Declaration ¶¶ 8-20; *see Ashapura*, 480 B.R. at 144 (the ability to "alternate between various remedial measures" is emblematic of satisfaction of this factor); *Betcorp*, 400 B.R. at 282 (noting that "the statutory ability to shift among various forms of dissolution given changing circumstances, demonstrate[s] that winding up is achieved under a law relating to insolvency or the adjustment of debts").

79.      Sixth, while the Xenfin Liquidation is not a formal proceeding under the direct monitoring of a Guernsey court, Xenfin's assets and affairs are nonetheless subject to the control or supervision of a foreign court concerning essential aspects of the liquidation.

80.      As the Southern District of New York has explained,

> Supervision or control of the company's affairs is not a demanding standard.  The foreign court need not control the day-to-day operations with the debtor.  It is sufficient, for instance, that the body monitor compliance with the repayment plan negotiated by the debtors and creditors … the fact that actions in a foreign court related to the proceeding are typically imitated by interested parties and that liquidators proceed with most of their duties without court involvement was found 'not [to] undermine the … court['s] supervisory role.

*Ashapura*, 480 B.R. at 138 (quoting *ABC Learning Ctrs.*, 445 B.R. at 332).

81.      The provisions of the Companies Law clearly illustrate that the Xenfin Liquidation is under the supervision of a Guernsey court, notwithstanding the ordinary control of the JVLs. The Companies Law permits a Guernsey court to remove the JVLs and appoint a replacement, reverse the Resolutions, and to sanction any *ultra vires* acts of a pre-liquidation director.  Brehaut Declaration ¶¶ 10, 12, 17-18; *see ABC Learning Ctrs.*, 445 B.R. at 331 (removal and replacement of director is evidence of court supervision).   Under the Companies Law, a Guernsey court can hear petitions from interested parties concerning "any aspect" of the Xenfin Liquidation, including a petition to convert the Xenfin Liquidation into a compulsory liquidation.   Brehaut Declaration ¶¶ 17-18.  As such, the Xenfin Liquidation meets the "low" standard for showing that a Guernsey court could supervise its assets and affairs.  *See Ashapura*, 480 B.R. at 144.

82.      Finally, the Xenfin Liquidation exists "for the purpose of reorganization or liquidation."   One of the express purposes of the Companies Law is to permit a debtor to voluntarily liquidate, as is the case here.  Brehaut Declaration ¶ 8; *see Cell C*, 571 B.R. at 553; *ABC Learning Ctrs.*, 445 B.R. at 332.  A voluntary liquidation is a statutory process under the law of Guernsey through which Xenfin is to be liquidated.  *Id.* ¶¶ 8-9.  The Resolutions commenced

the process and announced the liquidation, and the Declarations explain at length that the purpose

of the Xenfin Liquidation to is to liquidate Xenfin. *See Betcorp*, 400 B.R. at 284-85.

83.     For these reasons, the Xenfin Liquidation is a "foreign proceeding" in satisfaction

of 11 U.S.C. § 1517(a)(1).

### 3.    The JVLs are the "Foreign Representatives" of Xenfin

84.     A chapter 15 case is commenced by the filing of a petition by a "foreign

representative." *See* 11 U.S.C. § 1515(a). The Bankruptcy Code defines a "foreign representative"

as "a person or body, including a person or body appointed on an interim basis, authorized in a

foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or

affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).[13]

85.     The requirement that a foreign representative be authorized in a foreign proceeding

is "not an onerous one." *PT Bakrie*, 601 B.R. at 717. Section 101(24) does not require that the

foreign representative be appointed by a "foreign tribunal." *See Cell C*, 571 B.R. at 550.

86.     The Resolutions specifically gave the JVLs authority over Xenfin's assets and

allowed them to divide and distribute the assets at their discretion. Brehaut Declaration ¶¶ 13-14;

*see Cell C*, 571 B.R. at 553 (person appointed by resolution is a foreign representative); *see In re

OAS S.A.*, 533 B.R. 83, 98-100 (Bankr. S.D.N.Y. 2015) (appointing foreign representative by

board resolution that conferred authority to administer assets and liabilities). The JVLs are the

only representatives of Xenfin authorized to act on its behalf and have been carrying out their

duties under the Resolutions and Companies Law. Wright Declaration ¶¶ 108-115; *see Betcorp*,

400 B.R. at 294; *ABC Learning Ctrs.*, 445 B.R. at 333-34. These duties include correspondence

with the GFSC, negotiating a potential settlement to the Venetian Loans, controlling Xenfin's bank

---

[13] The "foreign representative" can be an individual. *See Ascot Fund*, 603 B.R. at 278 (citing 11 U.S.C. § 101(41)).

account at Butterfield Bank in Guernsey, authorizing the United States Litigation, and securing the proceeds owed to Xenfin resulting from the Venetian 1061 Sale. *Id.* ¶ 115.

87.     The JVLs are thus proper "foreign representatives" within the meaning of section 101(24) with respect to Xenfin, and section 1517(a)(2) is satisfied.[14]

### 4.     The JVLs Properly Filed this Case

88.     This JVLs duly and properly filed this proceeding as required by section 1504 of the Bankruptcy Code by filing the petition pursuant to 11 U.S.C. § 1515(a).

89.     The Petition was accompanied by all documents required by subsections 1515(b) and 1515(c), including the Resolutions, and the Federal Rules of Bankruptcy Procedure. *See Olinda Star*, 614 B.R. at 45.

90.     Accordingly, the JVLs satisfy the requirements set forth in section 1515 of the Bankruptcy Code and the Bankruptcy Rules. This Chapter 15 case has been properly commenced.

### C.     <u>The Xenfin Liquidation is a "Foreign Main Proceeding"</u>

91.     Section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if it is pending in the county where the debtor has its center of main interests ("**COMI**") as of the date of the petition for recognition.  11 U.S.C. § 1502(4); *see also Fairfield Sentry*, 714 F.3d at 127.  The COMI analysis when "applied to a special purpose financing vehicle provides less straightforward than the typical case." *OAS*, 533 B.R. at 101.  A debtor has only one COMI.  *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 79 (Bankr. S.D.N.Y 2011) ([E]very entity has a center of main interests.").

---

[14] Mr. Wright has also been recognized as a foreign representative with respect to a foreign main proceeding in the following cases under chapter 15 of the Bankruptcy Code: (i) *In re Platinum Partners Value Arbitrage Fund LP*, No. 16-12925 (Bankr. S.D.N.Y.); (ii) *In re Madison Niche Assets Fund, Ltd., et al.*, No. 16-10043 (KJC) (Bankr. D. Del.); and (iii) *In re Niton Fund SPC*, No. 15-13252 (SMB) (Bankr. S.D.N.Y.).

92.    Courts in this district have developed a list of non-exclusive, but "widely adopted" factors that may be considered when determining COMI:

> (1) the location of the debtor's headquarters; (2) the location of those who actually manage the debtor; (3) the location of the debtor's primary assets; (4) the location of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or (5) the jurisdiction whose law would apply to most disputes.

*Olinda Star*, 614 B.R. at 41 (citation omitted); *see also In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 272-73 (Bankr. S.D.N.Y. 2019). The Second Circuit has also emphasized the importance of criteria that are both objective and ascertainable to third parties to determine a debtor's COMI. *See Fairfield Sentry*, 714 F.3d at 136-37. An objective determination of COMI results from an examination of factors "in the public domain." *Id.* at 137 (citation omitted).

93.    Absent evidence to the contrary, a debtor's registered office is presumed to be its COMI. 11 U.S.C. § 1516(c). The legislative history indicates that this presumption was "designed to make recognition as simple and expedient as possible" in cases, as here, where COMI is not controversial. H. Rep. 109-31 pt. 1, at 112-13 (2005). When determining a debtor's COMI, the Bankruptcy Code provides "considerable but not complete discretion." *Serviços de Petróleo*, 600 B.R. at 278 (citation omitted).

94.    Xenfin is incorporated under the laws of Guernsey, and since its incorporation, maintained a registered office in Guernsey, creating a presumption that Guernsey is its center of main interests. Wright Declaration ¶¶ 8, 12; 11 U.S.C. § 1516(c). Since the appointment of the JVLs, the registered office of Xenfin is c/o Grant Thornton, Lefebvre House, Lefebvre Street, St Peter Port, Guernsey GY1 3TF. Wright Declaration ¶ 13. The registered office presumption is not rebutted, but confirmed, on the facts of this case.

95.    The presumption of COMI in Xenfin's favor is further confirmed by the facts and circumstances set out in the Declarations.

96.     It is objectively ascertainable by third parties that the COMI of Xenfin is Guernsey. Xenfin has always been registered in Guernsey and Guernsey serves as Xenfin's headquarters. The Articles of Association of Xenfin are to be read in conjunction with, and are subject to, the provisions of the Companies Law. *See Olinda Star*, 614 B.R. at 41; *Ascot Fund*, 603 B.R. at 279.

97.     Further, the JVLs are located in Guernsey.  At all times they have served as JVLs, the JVLs have been located in Guernsey, from where they (along with their staffs) have directed and conducted the Xenfin Liquidation.  From Guernsey, among other things, they have directed Guernsey and United States counsel (including to file the United States Litigation), regularly updated the GFSC as to the progress of the Xenfin Liquidation, liaised with the agent for Xenfin's investors, negotiated the potential settlement with MacInnes and Xenfin Capital, and repeatedly sought repayment of Xenfin's proceeds resulting from the Venetian 1061 Sale.  Wright Declaration ¶¶ 100-115; *see, e.g., Betcorp*, 400 B.R. at 292 (finding COMI in Australia "[t]he location of those that manage Betcorp -- the liquidators" were located); *Ascot Fund*, 603 B.R. at 280 (factor supports as COMI finding of the Cayman Islands when the "JOLs are based in the Cayman Islands … and they, along with their staff … have directed and conducted the [debtor's] liquidation in the Cayman Islands").

98.     With respect to Xenfin's assets, the primarily liquid asset of Xenfin is its bank account at Butterfield Bank in Guernsey, which the JVLs control.   Wright Declaration ¶ 114, Xenfin's other assets include the receivables owed under the Venetian Loans, the proceeds from the Venetian Sale, and from other investments located around the world.  Admittedly, these assets are not based in Guernsey.  However, this does not rebut the presumption, or the numerous other factors indicating that Guernsey is Xenfin's COMI.  *See Ascot Fund*, 603 B.R. at 285 (rejecting the argument that the location of the asset is the "key piece of evidence 'ascertainable by third

parties.'"); *Ocean Rig*, 570 B.R. at 704 (although existence of assets outside the jurisdiction of liquidation "complicated" the analysis, the prevailing evidence was that the liquidators "have engaged in various activities supporting their COMI in the Cayman Islands for a year").

99.     Xenfin currently has no creditors, so the location of creditors COMI factor is not presently implicated by the Xenfin Liquidation.

100.     Finally, by virtue of its being incorporated in Guernsey, Xenfin is subject to Guernsey's laws, regulations (including those promulgated by the GFSC), and its jurisdiction, including with respect to disputes. *See Olinda Star*, 614 B.R. at 43-44. Specifically, the Xenfin Liquidation is conducted pursuant to the Companies Law, meaning that Guernsey law would apply to most disputes. *See Betcorp*, 400 B.R. at 292 ("The voluntary winding up is being conducted pursuant to the Australian [insolvency laws] and therefore this is the law that would apply to most disputes."). Although Xenfin is subject to the laws of other jurisdictions, including pursuant to the governing law provisions of the Venetian Loan Documents, this does not necessarily weigh against a finding of COMI in Guernsey. *See Olinda Star*, 614 B.R. at 43-44 (weighing this factor in favor of debtor even if "it may be subject to other regulatory regimes").

### D.     **Alternatively, the Xenfin Liquidation is a Foreign Nonmain Proceeding**

101.     Although the JVLs submit that the Xenfin Liquidation is a "foreign main proceeding," in the alternative, the JVLs seek recognition of the Xenfin Liquidation as a "foreign nonmain proceeding." Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign county where the proceeding is pending." 11 U.S.C. § 1517(b)(2). "Establishment" is defined in Chapter 15 as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(5); *see Serviços de Petróleo*, 600 B.R. at 277 ("[T]he foreign debtor

must establish a degree of stable connections with the jurisdiction to constitute a nontransitory 'establishment.'"). Courts require proof of more than a "mail-drop presence." *Id.*

102.    Several factors "contribute to identify an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for period of time, and the objective appearance to creditors whether the debtor has a local presence." *Millennium Glob.*, 458 B.R. at 85. A "local effect on the marketplace" is evidenced by, among other things, engagement of local counsel. *Id.* at 86-87. At least one court holds that the presence of the liquidators is relevant to the determination of whether the debtor has an establishment in that location. *Id.* at 86.

103.    In this case, Guernsey is not merely a letter-box jurisdiction for Xenfin. The JVLs have centralized Xenfin's liquidation in Guernsey, where they reside. They have repeatedly notified the GFSC of the progress of the Xenfin Liquidation, worked to obtain proceeds from the Venetian 1061 Sale, negotiated repayment of the Venetian Loans, sought a settlement from Xenfin Capital and MacInnes, monitored the progress of the Venetian 1417 Property, and have had a local effect on the marketplace through the retention of Guernsey counsel. These actions are sufficient, at a minimum, support the finding of the "establishment" in Guernsey.

104.    For these reasons, in the event the Court concludes that the Xenfin Liquidation is not a foreign main proceeding, the Xenfin Liquidation should be recognized as a foreign nonmain proceeding.

**E.**    **The Requested Relief Accords with the Bankruptcy Code and U.S. Public Policy**

105.    A bankruptcy court may refuse to grant recognition under chapter 15 if the action "would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506; *see also Fairfield Sentry*, 714 F.3d at 139 ("[T]he word 'manifestly' in international usage restricts the

public policy exception to the *most fundamental policies of the United States*.") (emphasis in original).  Courts "interpret this exception as a narrow one that should be applied sparingly." *ENNIA Caribe*, 594 B.R. at 640 (citation omitted).  The proper focus is on whether a foreign proceeding violates "fundamental standards" of procedural "fairness."  *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010).

106.    The Xenfin Liquidation is clearly not "manifestly contrary to the public policy of the United States."  The Companies Law is consistent with approaches to liquidation in other countries, including with respect to the *pari passu* allocation of assets, the rights of stakeholders to petition the Guernsey court for redress, and the recordation of the Xenfin Liquidation in the Guernsey Registrar of Companies.  *See also ENNIA Caribe*, 594 B.R. at 640-41 (rejecting "due process concerns" in part because of a "variety of legal procedures" permitted to challenge the foreign proceeding); *ABC Learning Ctrs.*, 728 F.3d at 310 (*pro rata* distribution among levels of priority emblematic of a foreign proceeding that does not violate United States public policy).

107.    Indeed, recognizing the Xenfin Liquidation will assist the orderly administration of Xenfin's liquidation, consistent with the public policy of the United States that the Bankruptcy Code embodies.

## V.    THE COURT SHOULD GRANT THE JVLs' REQUEST FOR DISCRETIONARY RELIEF PURSUANT TO SECTION 1521 THE BANKRUPTCY CODE

108.    Section 1521(a) provides in relevant part that "[u]pon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief including . . . (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities[.]" *See In re Inversora Eléctrica de Buenos*

*Aires*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) (in the context of section 1521(a), the "Bankruptcy Code confers exceedingly broad discretion … that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors"); *see also Millennium Glob.*, 471 B.R. at 346 (citation and footnote omitted) ("Section 1521(a)(4) provides specifically that the Court may enter an order providing for 'the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities.' … By its terms, this provision enables a Foreign Representative to take broad discovery concerning the property and affairs of a debtor.").[15]

109.    Courts have recognized that the scope of discovery sought via 11 U.S.C. § 1521(a)(4) is particularly broad when the foreign representative is "gathering information which will enable them to comply with their duties." *Id.* at 390 (quoting *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 821 (Bankr. S.D.N.Y. 2018)).[16]

110.    Pursuant to section 1507, the Court may also grant discretionary relief to provide additional assistance beyond that permitted under section 1521 to a foreign representative.  11 U.S.C. § 1507(a).  In exercising discretion to grant relief under this section, courts are guided by the standards set forth in section 1507(b), which provides that a court:

> [i]n determining whether to provide additional assistance ... shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—(1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3)

---

[15] A foreign nonmain proceeding can be "granted nearly identical relief as the relief provided to a main proceeding." *Id.* at 272.

[16] Discovery sought via 11 U.S.C. § 1521(a)(4) is "not limited to documents in the United States.  Permissible discovery extends to documents in the possession, custody or control of a party, including documents held by a party's attorneys or agents" and the court "may order the production of documents from outside the United States." *See In re Markus*, 607 B.R. 379, 389-390 (Bankr. S.D.N.Y. 2019), *vacated sub nom. in part on other grounds*, *Markus v. Rozhkov*, 615 B.R. 679 (Bankr. S.D.N.Y. Apr. 3, 2020).  To that end, "[b]y its nature, chapter 15 involves parties located outside the United States.  Absent some express language in chapter 15 of any geographical limitation on the scope of discovery, there is no basis for [a bankruptcy court] … to impose such a limitation." *Id.* at 390.

prevention of preferential or fraudulent dispositions of property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.[17]

111.     Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary to carry out the provisions of this title."

112.     "In deciding whether to grant appropriate relief or additional assistance under chapter 15, courts are guided by principles of comity and cooperation with foreign courts." *Avanti*, 582 B.R. at 616.

113.     As set forth in the Declarations and in the *Emergency Motion for Provisional Relief Pursuant to 11 U.S.C. § 105(a), 1519, and 1521* (the "**Provisional Relief Motion**"), filed contemporaneously herewith, and which requests the immediate grant of the authority described in this Section V on a provisional basis pursuant to section 1519(a)(3) of the Bankruptcy Code in order to prevent irreparable harm to Xenfin and to enable the JVLs to carry out their duties under the Companies Law, in connection with the JVL's ongoing attempts to obtain information from Xenfin Capital and MacInnes regarding the status of the Venetian Properties, Xenfin's primary assets are still being investigated.  To that end, the JVLs are currently unable to ascertain the amount of proceeds from the Venetian 1061 Sale, the use of the proceeds, and even the individuals with signatory control over the bank accounts of the Venetian Entities – which appear to have comingled proceeds from the Venetian 1061 Sale in order to satisfy New Wave, who was granted

---

[17] Courts in this District have indicated that the "interplay between the relief available under sections 1507 and 1521 is far from clear."  *Olinda Star*, 614 B.R. at 46 (quoting *In re Acanti Comm'cns Grp.*, 682 B.R. 603, 615-16 (Bankr. S.D.N.Y. 2018)).  The Fifth Circuit held that a court must "first consider the specific relief enumerated under § 1521(a) and (b).  If the relief is explicitly provided for there, a court should then consider … § 1521's grant of any appropriate relief … [which is] relief previously available under Chapter 15's predecessor, § 304.  Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507."  *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1054.

security in the Venetian Properties in violation of the Venetian Loan Documents and Venetian Mortgages. *See* Wright Declaration ¶ 116.

114.   Simply put, the intransigence of Xenfin Capital and MacInnes has significantly impeded this investigation and the overall administration of Xenfin. *Id.* ¶ 117,

115.   In particular, during the JVLs' investigation, it has become readily apparent that the Xenfin Liquidation is materially hindered by the acts of Xenfin Capital, the Venetian Entities (and those acting on its behalf), and MacInnes, which include (*id.* ¶ 118):

   a.   repeated delays and misrepresentations in the transmission of assets purported to be held in cash;

   b.   in respect of the Venetian Properties, the interrelated failures of MacInnes and others with regard to allowing or failing to stop the grant of a potentially higher priority, asset-level security interest over the Venetian Properties to a third party, which is formally recorded and registered in the relevant land records;

   c.   lack of clarity as to the methods of payment for the amounts still owed by the Venetian Entities;

   d.   conflicting representations as to the authorized signatories of bank accounts of the Venetian Entities; and

   e.   recurrent broken promises to pay H&K proceeds from the Venetian Sale.

116.   Given this failure, and pursuant to the authority of the Resolutions, the JVLs ultimately determined that filing this Petition is in the best interests of Xenfin, and necessary to enable the JVLs to obtain discovery concerning, *inter alia*: (a) the failure to repay the Venetian Loans; (b) the circumstances of the transactions between New Wave and the Venetian Entities, including potential insider transactions; (c) the improper security interests granted over the

Venetian Properties in direct breach of the Venetian Loan Agreements; (d) the misrepresentations by MacInnes concerning the failed transactions in 2020 involving the Venetian Properties; (e) the clandestine and improper sale of the Venetian 1061 Property; (f) the refinancing of the Venetian 1417 Property that tripled its debt; (g) bank accounts held by MacInnes and Xenfin Capital to transmit purported payments to Xenfin; (h) the flow of funds from the Venetian Sale, including the purported intercompany loan between the Venetian Entities; (i) the realization value of the Venetian 1417 Property, which MacInnes has alleged could exceed $20 million; and (j) the individuals and/or entities sanctioned to act on behalf of the Venetian Entities. *Id.* ¶ 119.

117.    This information is crucial to understanding Xenfin's asset position, and thus to the efficient administration of its estate. Since the outset of the JVLs work on behalf of both GFG and Xenfin, the opacity of the investments of the Venetian Entities, and related transactions, preclude a full accounting on what can (and unfortunately at this stage, cannot) be recovered. *Id.* ¶ 120. Case in point: the JVLs thus far relied primarily on MacInnes for guidance as to the realization value of the Venetian Properties. At best, MacInnes is unreliable and capricious. At worst, he misled the JVLs repeatedly, including with respect to his ability to pay H&K the proceeds of the Venetian 1061 Sale –which itself closed <u>two months</u> prior to MacInnes's false assertion to the JVLs that a sale of the Venetian 1061 Property was imminent in <u>late December 2020</u>. *Id.*

118.    MacInnes has likewise not been forthright as to the structure of the encumbrances on the Venetian Properties, necessitating the discovery relief set forth in the Petition and the Provisional Relief Motion. The JVLs at present have not received a satisfactory explanation for the granting of a security interest to New Wave, but failing to ensure that Xenfin held a security interest. This *de facto* subordination of the senior creditor, Xenfin, resulted in a multimillion dollar payment to New Wave from the Venetian 1061 Sale that, at best, substantially delayed any

remuneration to Xenfin for the realization of one of its prime real estate assets.  Wright Declaration ¶ 121.  The New Wave Refinancing had similar injurious effects to Xenfin, as its second prime real estate assets in Florida is saddled with substantial debt, incurred without Xenfin's notice or consent, and in contravention of the Venetian Loan Agreements and Venetian Mortgages.  In short, the obstruction of accurate information material to Xenfin's asset position has manifestly impeded the JVLs' ability to carry out their duties under the Companies Law in an efficient manner.

119.     Accordingly, in light of the aim of chapter 15 to "optimize disposition of international insolvencies" by providing foreign representatives appropriate access to the U.S. court system, *see B.C.I. Fins. Pty Ltd.*, 583 B.R. at 292, and the clear, ongoing risk of diminution in value and/or diversion of Xenfin assets in the United States, the JVLs respectfully submit that the requested discovery authority is appropriate and necessary "to effectuate the purposes of [chapter 15] and to protect the assets of the debtor."  11 U.S.C. § 1521(a)(4).

120.     Moreover, relief under section 1521(a) may be granted if the interests of "the creditors and the other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  While the Bankruptcy Code does not provide a definition of "sufficient protection," the legislative history of section 1522 suggests that this requirement is meant to prevent the rights of United States creditors of the foreign debtor from being "seriously and unjustifiably injur[ed]."  H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005).  As such, courts have "great leeway" in determining whether the rights of all relevant parties are "sufficiently protected" and will generally consider a balancing of competing interests.  *See In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").

121.    The JVLs submit that all parties in interest are sufficiently protected here, because the requested relief pertains to information directly bearing upon the Debtor's assets and interests in the United States, which are central to the administration of the Xenfin Liquidation, and which the JVLs are unable to obtain from other sources and have been unable to obtain from the Discovery Subjects on a consensual basis.  Wright Declaration ¶¶ 116-122.  Further, the Discovery Subjects are not without recourse, and should they determine that the JVLs' discovery requests are prejudicial to their respective interests, they may file a motion and request relief from this Court.[18]

122.    Further, as noted above and as set forth in the Gluck Declaration and the Wright Declaration, the JVLs seek discovery authority with respect to the IBD Subjects in order to issue subpoenas for asset-tracing purposes, concerning, *inter alia*, accurately tracing and re-creating the flow of funds pertaining to wire transfer transactions denominated in U.S. Dollars processed by the IBD Subjects, specifically as they relate to the Venetian Entities, the Venetian 1061 Sale, and any "intercompany loans" effectuated between Venetian 1417 and Venetian 1061.  Gluck Declaration ¶¶ 8-10; Wright Declaration ¶¶ 88-103, 136.

123.    To that end, this Court routinely orders similar relief pursuant to section 1521(a)(4), including specifically for the wire transfer and account information sought with respect to the Venetian Entities via the IBD Subjects here.  *See* Gluck Declaration ¶¶ 11-22 & Exs. A-L; *see also, e.g.*, *Platinum Partners*, 583 B.R. at 811 (authorizing discovery in support of liquidation of Cayman Islands-based funds because its auditors had a "unique set of documents and analyses concerning the Funds' assets, liabilities and financial affairs which would assist the liquidators' investigation and understanding of the Funds' affairs for the two years immediately prior to the Funds' liquidations"); *In re Frontera Caucasus Corp.*, No. 19-13418-mew (Bankr. S.D.N.Y.

---

[18] Further, as set forth in the Proposed Order, the requested discovery authority is without prejudice to the Discovery Subjects' rights to object to the JVLs' exercise of such authority in accordance with the applicable procedural rules.

2019) (recognizing Cayman Islands proceeding as a foreign main proceeding and authorizing issuance of subpoenas concerning suspect transfers and transactions to debtor's accountants and executives); *In re Archetype Investments Fund SPC Ltd.*, No. 19-11996-shl (Bankr. S.D.N.Y. 2019) (recognizing British Virgin Islands liquidation as a foreign main proceeding and authorizing issuance of subpoenas to New York Banks); *In re Pinnacle Glob. Partners Fund I Ltd.*, No. 19-11573-rg (Bankr. S.D.N.Y. 2019) (recognizing Cayman Islands liquidation as a foreign main proceeding and authorizing issuance of subpoenas to New York Banks); *In re HiTs Africa Ltd.*, No. 18-11822-mew (Bankr. S.D.N.Y. 2018) (same).

124.    As such, the JVLs submit that the additional relief requested under section 1521(a)(4) authorizing them to examine witnesses, take evidence and obtain information concerning the Debtor's assets, affairs, rights, obligations and/or liabilities, is necessary and warranted under the circumstances.

## VI.    REQUEST FOR WAIVER OF LOCAL BANKRUPTCY RULE 9013-1(a)

125.    It is respectfully requested that this Court waive and dispense with the requirement set forth in Rule 9013-l(a) of the Local Rules for the United States Bankruptcy Court for the Southern District of New York that any motion filed shall be accompanied by a memorandum of law on the grounds that the relevant authorities in support of the Petition are contained herein.

## VII.   HEARING DATES AND NOTICES

126.    Section 1517(c) of the Bankruptcy Code requires that "[A] petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time."  Bankruptcy Rule 2002 sets forth a twenty-one day notice requirement to parties in interest with certain exceptions to approve the Petition.  If no objections to this Petition are filed by the date ordered for such objections, the JVLs request that the Court enter the proposed order recognizing the Xenfin Liquidation as a foreign main proceeding without a hearing pursuant to Local Rule 2002-2;

however, the JVLs and their counsel are of course willing to appear and will be prepared to answer any questions that the Court may have.

127.    Subsection (q)(1) of Rule 2002 governs notice of a petition for recognition of a foreign proceeding. Contemporaneously herewith, the Debtor has filed the *Motion for Order Specifying Form and Manner of Service of Notice*. The JVLs propose to provide service and notice of this Petition in accordance with Fed. R. Bankr. P. 2002(q), and the procedures and deadlines specified in the proposed *Order Specifying Form and Manner of Service and Notice*, which the JVLs respectfully submit constitutes sufficient service and notice of this Petition.

128.    No previous application for the relief requested in this Petition has been made in this or any other court in the United States.

## CONCLUSION

WHEREFORE, the JVLs respectfully request that this Court enter an Order, substantially

in the form of Exhibit 1 to this Petition, granting the relief requested herein and such other and

further relief as may be just and proper.

Dated: January 26, 2021
　　　 New York, New York

　　　　　　　　　　　　　　　 HOLLAND & KNIGHT LLP


　　　　　　　　　　　　　　　 /s/ _Warren E. Gluck_____
　　　　　　　　　　　　　　　 Warren E. Gluck, Esq.
　　　　　　　　　　　　　　　 Kathleen M. St. John, Esq. (*pro hac vice forthcoming*)
　　　　　　　　　　　　　　　 Elliot A. Magruder, Esq.
　　　　　　　　　　　　　　　 HOLLAND & KNIGHT LLP
　　　　　　　　　　　　　　　 31 W. 52nd Street
　　　　　　　　　　　　　　　 New York, NY 10019
　　　　　　　　　　　　　　　 Telephone:  212-513-3200
　　　　　　　　　　　　　　　 Fax: 212-385-9010
　　　　　　　　　　　　　　　 Warren.Gluck@hklaw.com
　　　　　　　　　　　　　　　 Kathleen.StJohn@hklaw.com
　　　　　　　　　　　　　　　 Elliot.Magruder@hklaw.com


　　　　　　　　　　　　　　　 *Counsel for the Joint Voluntary Liquidators of Xenfin*
　　　　　　　　　　　　　　　 *Fund 1 Trading Limited (in Voluntary Liquidation)*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Matthew Wright declares as follows:

Along with Benjamin Rhodes, and James Toynton, I am a duly appointed voluntary liquidator of Xenfin Fund 1 Trading Limited (in Voluntary Liquidation), which is in voluntary liquidation pursuant to sections 391 to 405 of Part XXII of the Companies (Guernsey) Law 2008. I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Insolvency Proceeding and Related Relief* (the "**Verified Petition**"). I have read the Verified Petition, and I am informed, and believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26TH day of January, 2021 in GUERNSEY.

_____
Matthew Wright, in his capacity as a joint voluntary liquidator of Xenfin Fund 1 Trading Limited (in Voluntary Liquidation)

42